IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Criminal No. 3:13-CR-253-D |
| | § | |
| CLAYTON TODD EARTHMAN, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant Clayton Todd Earthman ("Earthman")—charged with possession of a firearm by an unlawful user of a controlled substance, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2), and possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871—moves to suppress all evidence seized on June 18, 2013 following the stop of the vehicle he was driving, all statements he made at the scene following his arrest arising from the traffic stop and inside police headquarters, all evidence recovered from his parents' residence on Grande Casa Road in Waxahachie, Texas (where he occupied a room), and all evidence seized from his residence on Woodard Avenue in Dallas.[1] Following an

---

[1] Although the written motion is arguably broader, Earthman acknowledged at the suppression hearing that, apart from challenging the lawfulness of the traffic stop and the seizure of the pistol, his remaining challenges are based on the fruit of the poisonous tree doctrine. He does not challenge on independent grounds the lawfulness of the ensuing vehicle search, his custodial interrogation, or the searches at the two residences.

evidentiary hearing, and for the reasons that follow,[2] the court denies the motion.

I

On June 18, 2013 two Dallas Police Department ("DPD") officers, James Cutbirth ("Officer Cutbirth") and Jeremiah Byous ("Officer Byous"), were conducting surveillance of a known drug house located near the intersection of Hilltop Street and Lovett Avenue in Dallas. At this intersection, there are two stop signs, which apply to traffic traveling north and south, but no lined crosswalks or stop lines on the street. The officers were parked 1½ blocks (about 1/10th of one mile) from the intersection in a marked unit.[3] Using binoculars, both officers were able to observe traffic coming and going from the suspected drug house via the intersection of Hilltop Street and Lovett Avenue. Both officers were familiar with this intersection from prior experience. Officer Cutbirth, in particular, had traveled this intersection and surveilled this house several times before. He tries to drive through the intersection at least once daily.

At approximately 1:00 p.m., Officers Cutbirth and Byous observed a vehicle, later identified as Earthman's, turn onto Hilltop Street, where the drug house was located. After a brief period (approximately three to five minutes), the vehicle came back into view as it turned onto Lovett Avenue from Hilltop Street. Using their binoculars, the officers observed

---

[2]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

[3]The officers chose this location to avoid detection by persons associated with the suspected drug house.

the vehicle make a left turn from Hilltop Street onto Lovett Avenue in one constant, fluid motion, without stopping at any point—including at the stop sign located on Hilltop Street. After Earthman's vehicle passed the officers' police unit, the officers made a U-turn and effected a traffic stop based on the traffic violation they had observed him commit when he failed to stop when he turned onto Lovett Avenue from Hilltop Street.

As the officers approached Earthman's vehicle on foot, they observed that he was visibly nervous and that he made several furtive gestures. Officer Cutbirth approached on the driver side, while Officer Byous approached on the passenger side. Both officers were concerned for their safety because Earthman was leaving a known drug house after a short visit, he was making furtive gestures, and he could be hiding a weapon. In the officers' experience, this type of short visit is characteristic of someone involved in a drug transaction, and weapons and drugs often go hand-in-hand.

For officer safety, Officer Cutbirth ordered Earthman to exit the vehicle. After Earthman did so, Officer Cutbirth immediately observed in plain view an empty pistol holder on the floorboard near the gas pedal and a pistol on the floorboard near the driver seat. Rather than announce that he had found a weapon, Officer Cutbirth asked Earthman where his pistol was located, which was a form of code that Officers Cutbirth and Byous used when indicating that a weapon had been found. Earthman was handcuffed for officer safety but was not informed that he was under arrest. Officer Cutbirth determined that the weapon was loaded, disarmed it, and checked to see whether it was stolen. At that point, Officer Cutbirth intended to arrest Earthman for the offense of unlawful carrying of a weapon ("UCW"), in

violation of Tex. Penal Code Ann. § 46.02 (West 2011).[4]

Earthman moves to suppress the evidence seized during and following the initial traffic stop on June 18, 2013. The government opposes the motion.

II

"A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)). "However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *Id.* (citing *United States v. Castro*, 166 F.3d 728, 733 n.7 (5th Cir. 1999) (en banc)). "The exclusionary rule prohibits introduction at trial of evidence obtained as the result of an illegal search or seizure." *United States v. Runyan*, 275 F.3d 449, 466 (5th Cir. 2001). The exclusionary rule also "encompass[es] evidence that is the indirect product or 'fruit' of unlawful police conduct." *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *United States v. Miller*, 146 F.3d 274, 277 (5th Cir. 1998) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). The government bears the burden of proving at a suppression hearing by a preponderance of the evidence that the

---

[4]Because Earthman's remaining challenges are based on the fruit of the poisonous tree doctrine, *see supra* note 1, the court will not recount the evidence concerning the searches and seizures that followed the seizure of the weapon from the vehicle Earthman was driving.

Fourth Amendment has not been violated. *United States v. Matlock*, 415 U.S. 164, 177-78 n.14 (1974).

III

The court finds that the government proved by a preponderance of the evidence that the police had probable cause to effect the stop of Earthman's vehicle.

A

Both officers observed Earthman fail to stop when turning from Hilltop Street onto Lovett Avenue, in violation of Tex. Transp. Code Ann. § 544.010 (West 2011). Earthman's vehicle approached the intersection of Hilltop Street and Lovett Avenue and turned left from Hilltop Street onto Lovett Avenue in one constant, fluid motion, without stopping at any point.[5]

---

[5] At the hearing, the government and Earthman devoted considerable attention to addressing what they contend Tex. Transp. Code Ann. § 544.010(c) requires when an intersection has a stop sign but no crosswalk or stop line. Section 544.010(c) provides that "the operator shall stop at the place nearest the intersecting roadway where the operator has a view of approaching traffic on the intersecting roadway." Under the government's view, § 544.010(c) would require in such circumstances that the vehicle operator make two stops: one at the stop sign and another at the place nearest the intersecting roadway where the operator has a view of approaching traffic on the intersecting roadway. The court need not resolve this dispute, however, because it finds that Earthman turned left from Hilltop Street onto Lovett Avenue in one constant, fluid motion, without stopping at all. It is therefore unnecessary to address whether Earthman would have violated § 544.010(c) had he stopped at the stop sign on Hilltop Street but then failed to stop a second time at the place nearest Lovett Avenue where he had a view of approaching traffic on Lovett Avenue. Additionally, it is not controlling whether the officers could see the stop sign itself; they were able to observe that Earthman failed to stop at any point when turning from Hilltop Street onto Lovett Avenue, and they therefore had probable cause to believe that a traffic violation had occurred.

B

At the hearing, Earthman challenged the credibility of the officers' testimony on several grounds. The court as trier of fact is not obligated to explain why it has found the officers' testimony to be credible or has weighed the evidence as it has. But the court will address two of Earthman's challenges because they are somewhat related, and Earthman relied on one of them to request that the suppression hearing be adjourned and resumed later so that he could pursue additional evidence.

As of the date of the hearing, Officers Cutbirth and Byous were the subjects of a DPD Internal Affairs administrative inquiry concerning a potentially illegal search and seizure that occurred within eight days of Earthman's traffic stop. Since the inquiry was initiated, Officers Cutbirth and Byous have been assigned to administrative desk duty. The officer who initiated the inquiry is Kenneth R. Dortch ("Lt. Dortch"). Earthman subpoenaed Lt. Dortch to testify at the suppression hearing.

According to Lt. Dortch's testimony, he was approached by one of his detectives about a search warrant that had been requested by Officers Cutbirth and Byous. The detective informed Lt. Dortch that he was not comfortable putting his name on the warrant application. Lt. Dortch testified that he is not an expert in search-and-seizure case law and that the propriety of the search warrant application was open to interpretation, so he referred the matter to Internal Affairs for an administrative inquiry. Lt. Dortch explained that he was not the supervising officer for Officers Cutbirth and Byous, had never met them prior to the suppression hearing, and had no reason to question their truthfulness. He testified that he

read the detective's report and referred the matter to Internal Affairs because it was outside his expertise. But in doing so, he was not accusing either officer of any wrongdoing. He also explained that, although the administrative inquiry is classified as pertaining to an "illegal search and seizure," that is because it was necessary that he select a classification from an automated drop-down menu in the DPD computer system, and that it was the closest descriptor available—not because he actually considered what they had done to be an illegal search and seizure. The court therefore finds that Lt. Dortch's testimony concerning the Internal Affairs administrative inquiry does not undermine the credibility of the testimony of Officers Cutbirth and Byous.

During the suppression hearing, Earthman moved for a continuance for the purpose of further investigating the administrative inquiry, and the court took the motion under advisement. After considering Lt. Dortch's testimony and all the evidence presented at the hearing, the court denies the continuance motion. Earthman was able to call as a witness the officer who initiated the administrative inquiry. Lt. Dortch testified that he had no reason to doubt Officer Cutbirth's or Officer Byous' truthfulness. Nor did he have any reason to believe that either officer had committed any wrongdoing in the matter. He merely referred the matter to Internal Affairs and used a preselected descriptor from an automated drop-down menu. He did not have the freedom to describe the subject matter of the inquiry with more accurate terminology, and in referring the matter, he was not accusing the officers of committing an illegal search or seizure. Earthman has failed to demonstrate a reasonable probability that further investigation into the administrative inquiry will yield facts that

would undermine the officers' credibility. And the information he seeks—if it exists at all—would merely serve to impeach their testimony based on a collateral matter.

Earthman also challenges Officer Byous' credibility on the ground that Internal Affairs sustained a finding against him for his conduct in a 2010 case. Officer Byous was the lead officer in a "knock-and-talk" investigation. During the investigation, he knocked on the door of a residence, asked a woman if he could come in, and she consented. He later described his entry into the woman's residence to a third-party police officer who needed the description for a warrant application. According to Officer Byous, he reported to the other officer that the woman had told him, "Sure, come on in." The quoted language was included in the affidavit that supported the warrant, which was later executed. Officer Byous was later confronted with the affidavit in court, and he admitted that the woman did not verbally say anything to him. Instead, she impliedly consented using nonverbal gestures. The prosecutor decided to drop the case, and Internal Affairs entered a sustained finding against him in 2011 for causing the inaccuracy in the affidavit.

Earthman argues that this finding undermines Officer Byous' credibility because it casts doubt on his truthfulness. Considering Officer Byous' hearing testimony in its entirety, including his demeanor on the stand, the court is not persuaded that it does. Officer Byous explained that the reason for the inaccurate affidavit was an innocent misunderstanding between him and the third-party officer. Had he reviewed the affidavit before it was presented to him, he likely would have caught the mistake and corrected it. He also explained that, before being confronted with the affidavit in court, he did not understand the

significance of the difference between actual, verbal consent and implied, nonverbal consent, which is a plausible explanation for his mistake. When confronted with the inaccurate affidavit he did not attempt to hide his mistake or to shift the blame to someone else. The court therefore finds Officer Byous' testimony credible despite this Internal Affairs finding in the unrelated case.

C

Because Earthman's failure to stop at the stop sign violated Texas law, Officers Cutbirth and Byous had probable cause to effect the traffic stop.

IV

The court next considers the lawfulness of the police officers' conduct during the traffic stop and their seizure of the weapon located on the driver side floorboard of Earthman's vehicle.

A

Courts examine the legality of traffic stops under the two-pronged analysis described in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). *See United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). "Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* (citing *Terry*, 392 U.S. at 19-20). Under the second prong, the issue is whether the officer's actions "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Id.* at 507.

A warrantless seizure of an item is permissible if "(1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was immediately apparent; and (4) the police had a lawful right of access to the item." *United States v. Virgil*, 444 F.3d 447, 451 (5th Cir. 2006) (citing *United States v. Buchanan*, 70 F.3d 818, 825-26 (5th Cir. 1995)) (internal quotation marks omitted).

Earthman contends that the weapon was not in plain view and that the officers lacked probable cause to arrest him for UCW.

B

The court first considers the actions of the officers when they directed that Earthman exit his vehicle. Both officers were concerned for their safety when they approached Earthman's vehicle and initially made contact with him. Officer Cutbirth observed Earthman moving nervously inside the vehicle and making several furtive gestures. Officer Byous observed that Earthman appeared "visibly nervous" and that he was moving "feverishly" inside the vehicle. The neighborhood in which the stop was made is known as a high-crime, high-drug, violent area. In Officer Cutbirth's experience, the possession of drugs is often associated with the carrying of weapons. Both officers suspected that Earthman had departed from a known drug house just minutes before he was stopped.

Based on the totality of circumstances, the court finds that it was reasonable for the officers to order Earthman to exit the vehicle because their decision was reasonably related to dispelling the reasonable suspicion that had developed during the traffic stop.

- 10 -

C

The court finds next that the weapon was in plain view. After Earthman exited the vehicle, Officer Byous handcuffed him out of concern for officer safety.[6] As soon as Earthman exited the vehicle, Officer Cutbirth observed an empty pistol holder on the driver side floorboard near the gas pedal. Immediately thereafter, he observed a loaded pistol on the floorboard near the driver seat. The pistol was in plain view and was not under or obstructed by the driver seat. Officer Cutbirth asked Earthman where the pistol was, signaling to Officer Byous that he had found a weapon and that they were possibly dealing with a dangerous individual. Officer Cutbirth then seized the weapon, determined that the weapon was loaded, disarmed it, and checked to see whether it was stolen. He displayed the weapon in front of the police unit's dashboard camera so that it would be recorded.

The four requirements of the plain view doctrine were satisfied: Officer Cutbirth lawfully entered the area where the pistol was located pursuant to a valid *Terry* stop; the pistol was in plain view; the incriminating nature of the item was immediately apparent;[7] and Officer Cutbirth had a lawful right to access the pistol. *See, e.g., United States v. Rumley*,

---

[6]For example, as soon as Earthman exited the vehicle, he placed his hands inside his pockets, contrary to the officers' orders.

[7]The incriminating nature of the pistol was immediately apparent because, under Texas law, a person commits the offense of UCW if he intentionally, knowingly, or recklessly carries on or about his person a handgun in a motor vehicle that is owned by the person or under the person's control at any time in which the handgun is in plain view. *See* Tex. Penal Code Ann. § 46.02(a-1) (West 2011). The court discusses this statute below because it also supplies the basis for the officers' probable cause determination.

588 F.3d 202, 205-06 (4th Cir. 2009).

D

The court finds next that the officers had probable cause to arrest Earthman for UCW. Officer Cutbirth testified that, as soon as he saw the pistol on the floorboard, he intended to arrest Earthman for UCW.[8]

"The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (parentheses omitted)). "Probable cause exists if, under the totality of circumstances, there is a fair probability that . . . an illegal act is taking place." *United States v. Thompson*, 2012 WL 1161609, at *3 (N.D. Tex. Apr. 9, 2012) (Fitzwater, C.J.) (citing *United States v. Newman*, 472 F.3d 233, 236-37 (5th Cir. 2006)).

Tex. Penal Code Ann. § 46.02(a-1) provides, in pertinent part:

> A person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun in a motor vehicle . . . that is owned by the person or under the person's control at any time in which:
>
> (1) the handgun is in plain view; or
>
> (2) the person is:

---

[8]Earthman contends that there was no probable cause to support the arrest for UCW and so the ensuing search was invalid. He does not contest the legality of the ensuing search on independent grounds; rather, he argues that, without a valid arrest, the remaining evidence seized was fruit of the poisonous tree.

- 12 -

>> (A) engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic or boating;
>>
>> (B) prohibited by law from possessing a firearm; or
>>
>> (C) a member of a criminal street gang, as defined by Section 71.01.

Tex. Penal Code Ann. § 46.02(a-1) (West 2011). Under Texas law, the pistol—even though it was on the floorboard of the vehicle—could still provide the basis for establishing a violation of this statute. *See, e.g., Fraire v. State*, 2001 WL 1429422, at *4 (Tex. App. Nov. 15, 2001) (no pet.) (not designated for publication) (handgun in plain view where handgun was on floorboard of vehicle and partially covered); *Hazel v. State*, 534 S.W.2d 698, 703 (Tex. App. 1976) (no pet.) (handgun in plain view where handgun was on floorboard of vehicle and exposed when defendant was asked to exit vehicle).

Earthman challenges the officers' probable cause determination only insofar as he contends that the pistol was not in plain view. The court has already found that the pistol was in plain view when Officer Cutbirth observed it. Accordingly, the officers had probable cause to arrest Earthman for UCW, a violation of Tex. Penal Code Ann. § 46.02(a-1).

V

In addition to challenging the lawfulness of the initial traffic stop and the seizure of the pistol from his vehicle, Earthman challenges the other searches, seizures, and conduct at issue as fruit of the poisonous tree. Because the court has held that the traffic stop and the seizure of the pistol from the vehicle were lawful, it follows that none of the remaining

- 13 -

evidence or statements in question are fruit of the poisonous tree. Accordingly, the court denies Earthman's motion in this respect.

* * *

For the reasons explained, Earthman's motion to suppress is denied.

**SO ORDERED.**

January 21, 2014.

                                                SIDNEY A. FITZWATER
                                                CHIEF JUDGE